***********
The undersigned have reviewed the prior Opinion and Award based upon the record of proceedings before Deputy Commissioner Dollar and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award, except with modifications to Findings of Fact #12 and #34 and minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in their Pre-Trial Agreement filed on 12 January 1999 as
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Industrial Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. Zenith Insurance Company/RISCORP (GRIT) was the carrier on the risk.
3. The employee-employer relationship existed between the parties at all relevant times.
4. The dates of the alleged injuries are 29 September 1997 and 3 November 1997.
5. On 29 September 1997, plaintiff's average weekly wage was $396.29, which yields a compensation rate of $264.21 per week.
6. The issues for determination are:
 a. Whether plaintiff sustained an injury by accident arising out of and in the course of her employment on 29 September 1997, which has been assigned as I.C. File 828950, and if so, to what benefits may she be entitled under the Act?
 b. Whether plaintiff sustained an injury by accident arising out of and in the course of her employment on 3 November 1997, which has been assigned as I.C. File 801090, and if so, to what benefits may she be entitled under the Act?
7. Plaintiff began her employment with the defendant on 3 March 1997 and last performed work duties for said employer on 26 June 1998.
8. The depositions of Dr. Melody St. John, Dr. Rodney S. Lockala and Scott Schuck, D.C. were entered into evidence after the hearing before Deputy Commissioner Ford and were admitted into the record by Deputy Commissioner Dollar.
9. The parties stipulated the following documentary evidence:
a. Stipulated Exhibit 1 Plaintiff's Attendance Chart,
 b. Stipulated Exhibit 2 6 December 1997 Workers' Compensation Form,
 c. Stipulated Exhibit 3 Plaintiff's Answers to Interrogatories,
 d. Stipulated Exhibit 4 11 January 1999 Letter regarding plaintiff's employment status, and
e. Medical Records,
1. Jeffrey Aita, D.C., eleven pages,
2. Riverside Medical Associates, forty-two pages,
3. Sampson Regional Medical Center, five pages,
4. Wilkes Regional Medical Center, forty pages,
5. Dr. John L. Bond, Jr., two pages,
6. Dr. David D. Kim, five pages,
7. Dr. John A.H. Porter, one page,
8. Scott Shuck, D.C., eleven pages,
9. 1998 examination results, six pages;
10. Dr. Walton Curl, four pages,
11. Dr. William O. Bell, three pages,
12. Dr. Noland Hagood, four pages,
13. Baptist Therapy Center, two pages,
14. Dr. Alfred L. Rhyne, III, four pages,
15. Dr. Paul C. Perlik, four pages,
16. Dr. Jeffrey K. Ketcham, twenty-two pages,
17. Dr. Lewis F. Bracy, three pages,
18. Dr. David Davila, nine pages,
19. Dr. Melody St. John, fifteen pages,
20. Dr. Roddy Lockala, nine pages, and
 21. Libby Memorial Physical Medicine Center, fourteen pages.
 ***********
Based upon all of the competent evidence from the record the Full Commission makes the following:
 FINDINGS OF FACT
1. In September of 1997, plaintiff was a forty-eight year old female, with a Bachelor of Arts degree in psychology. She had prior knee surgery. She was employed as a child abuse and neglect detective with the Wilkes County Sheriff's Department. As this was a sworn law enforcement officer, plaintiff was required to complete basic law enforcement training at the N.C. Justice Academy in Salemburg.
2. Prior to 1997, plaintiff worked as a temporary employee for four months, as a substitute teacher for almost three years, as a part-time bank teller for one year, for nine months as a bookkeeper, for one year in marketing for a family business, for six months with Social Services, as well as eight or nine other short-term jobs.
3. Plaintiff has treated with Riverside Medical Associates since at least December of 1992 for her general medical care. On 19 September 1996, plaintiff sought treatment for bilateral foot pain of four-month duration and of both hands hurting in the joints.
4. On 10 October 1997 at approximately 2:50 p.m., plaintiff telephoned Riverside Medical Associates to advise that she had a bad bruise on her right inner arm, that the bruise was better; but there is a lump where the bruise was. She made an appointment and was seen by Dr. Bradley Templeton who examined her. He diagnosed plaintiff with a right inner arm thrombosis (blood clot) just above the elbow for which he prescribed Naprosyn. Dr. Templeton rechecked plaintiff on 15 October 1997, noting generalized tenderness in the inner arm and noted, "No trauma to upper arm" in his medical records. However, no other problems were noted. Dr. Templeton did not give plaintiff any out-of-work excuses.
5. Plaintiff sought treatment from Jeffrey Aita, D.C., on 10 October 1997 for right shoulder, low back, and knee. The medical questionnaire reflected plaintiff's attorney as her source of payment/referral. She reported a history of injury in training on an obstacle course, in learning techniques and skills to climb/scale six-foot wall, when she injured her right arm. Though plaintiff received these chiropractic adjustments from 10 October 1997 through 4 February 1998, there is no evidence this treatment was necessary due to any right arm bruise she sustained on 29 September 1997.
6. Plaintiff sought treatment at Wilkes Regional Medical Center on 18 October 1997 for complaints of a right arm injury during a training exercise. She was diagnosed with a severe bruise to the upper right arm. An ultrasound on 21 October 1997 revealed no hematoma and no deep vein thrombosis.
7. Although Dr. Templeton and Dr. Bowman diagnosed plaintiff with a right arm thrombosis, the ultrasound taken on 18 October 1997 indicated no blood clot in the arm. Therefore, the competent evidence supports a finding that plaintiff only sustained a right arm bruise in the training exercise on 29 September 1997.
8. On 4 November 1997, plaintiff telephoned Riverside Medical Associates to report she had a goose egg sized growth inside her left arm at the elbow, which was not a bruise. She was instructed to go to the local emergency room. At no time did plaintiff complain of an injury to her low back, left arm or of other injuries. In addition, plaintiff did not report any incident of pulling a man or dummy out of a vehicle as she later alleged.
9. Plaintiff presented to the emergency room at Sampson Medical Center on 4 November 1997 at 2:40 p.m., where she reported that she noted a nodule at the left antecubital fossa, which she found this morning while having her blood pressure checked. She reported having done a lot of pushups and pull-ups yesterday at the Justice Academy. An ultrasound did not reveal any specific abnormalities. She was diagnosed with a contusion and instructed to follow-up with her family doctor. Plaintiff did not report any history of an episode pulling a man or dummy out of a vehicle or any injury to her low back as she later alleged.
10. On 6 December 1997, plaintiff completed a workers' compensation form for her employer on which she noted she sustained a bruise the size of a large oval egg on the upper inside right arm on 29 September 1997 while attempting to scale a six foot wall as part of training. She also noted a sore right shoulder. She further reported that on 3 November 1997, she suffered a broken blood vessel in her left arm due to intense physical training to pass an obstacle course. She indicated the bruise was resolving but the broken blood vessel was not. Plaintiff did not note any right shoulder injury or any back injury.
11. In December 1997, plaintiff returned to her family doctor with complaints of significant tenderness in both lower arms, which, based upon plaintiff's history of the injuries, the doctor found to be secondary to the exercise and obstacle regime for the Sheriff's Department.
12. Plaintiff had no lost time from work after the 29 September 1997 right arm bruise.
13. Plaintiff was out of work from 15 December 1997 until 23 February 1998 though she received a full salary through 31 December 1997.
14. On 6 January 1998, Dr. John L. Bond, a general and traumatic surgeon, examined plaintiff on referral by her family doctor. She related a history of a 29 September 1997 incident in which she injured her right upper arm while attempting to scale a six-foot wall. She further stated she had a second injury on 3 November 1997 in which she injured her left arm while engaging in pushups and pull-ups for upper body strength training. On examination, Dr. Bond found plaintiff to exhibit good range of motion in the right shoulder, elbow and arm. He found plaintiff's right arm bruise had completely recovered, and she retained no permanent impairment to the arm.
15. Dr. Bond found plaintiff had a congenital hyperextension of the left elbow and a palpable mass at the left elbow, which he opined was a lipoma at the medial epicondyle. Plaintiff only saw Dr. Bond on one occasion.
16. On 14 January 1998, plaintiff had an ultrasound of the left arm at Wilkes Regional Medical Center, which revealed a probable lipoma, measuring two centimeters in diameter, in the subcutaneous tissue of the left antecubital fossa. On 23 January 1998, Dr. David Kim excised the lipoma or soft tissue tumor in the outpatient surgery center. Plaintiff reported a history of developing the lipoma after law enforcement training in which she developed a large hematoma; and after the hematoma resolved, this mass was palpable.
17. The surgical pathology report, dated 26 January 1998, found "a disc-shaped yellow-tan lobulated piece of tissue measuring 2.2 x 2.2 x .9 centimeters. The specimen appeared to be encapsulated in a thin membrane. Upon cross sectioning the specimen, it shows a yellow-tan, soft cut surface."
18. Plaintiff returned to work with the Sheriff's Department on 24 February 1998 in a sedentary office position, which was suitable employment. She voluntarily left this position on 26 June 1998 to marry and relocate to Arkansas. Plaintiff's job with the Sheriff's Department continued to be available after 26 June 1998.
19. On 26 February 1998, plaintiff prepared two I.C. Forms 18, Notice of Injury. On the Form 18 regarding the 29 September 1997 injury, plaintiff noted, "when attempting to scale a 6' wall in obstacle course of training, hit and pulled right upper arm." The nature and extent of injury is noted as "deep muscle bruise, muscle strain in right upper arm and shoulder." On the Form 18 for the 3 November 1997 incident, plaintiff noted the accident was caused by "excessive bumping of left arm in obstacle course training and jerked and pulled left arm when doing pull-ups on bar in gym." The nature and extent of the injury is noted as "deep bruise (contusion) and hematoma in left arm and elbow."
20. Defendants filed an I.C. Form 61 Denial for the September claim on 27 January 1998 and a Form 61 for the November claim on 29 January 1998.
21. In a 6 October 1998 letter, Dr. Thomas Bowman wrote plaintiff sustained permanent damage to both arms due to strenuous exercise and muscular use. Although Dr. Bowman noted the lipoma had intracapsular hemorrhage secondary to trauma, this is not supported by the pathology report and is therefore rejected as not being competent evidence.
22. Plaintiff sought chiropractic treatment in Arkansas from Scott Schuck on 14 October 1998. She reported a history of injuring her right shoulder and arm in September 1997 while attempting to scale a wall. Plaintiff first raised a complaint regarding neck pain in this appointment. She further stated that she hit the wall from the right side, shoulder to hip and had immediate pain. She stated she reported to her prior chiropractor that she had a large severe bruise in the shoulder area. She also began complaining of pain in her neck and to the left side. Dr. Schuck diagnosed plaintiff with cervical brachial syndrome, which he related to the September 1997 injury, based upon plaintiff's history of onset of symptoms.
23. In October of 1998, plaintiff obtained a 30-hour per week job at Henderson State University. Since leaving North Carolina in 1998, she has had five other jobs, working up to 50-60 hours per week. At the time of her deposition in August 2002, she was working full time for Terminix in the customer service department.
24. On 16 December 1998, Dr. Walton Curl, a board certified orthopedic surgeon, examined plaintiff for right arm and low back pain. During the examination, plaintiff related a history of hitting a wall during basic law enforcement training. She further stated she had a black and blue bruise mark over her right arm; and after that, she continued to have problems in her right arm with pain up and down her arm and into her neck and right lower lumbar with mild radicular symptoms. She also reported hurting her left arm on 3 November 1997 while doing some lifting, during which she reinjured her right arm. Dr. Curl found plaintiff to have full range of motion in the right arm, with tenderness at the right rotator cuff and a positive impingement sign, as well as tenderness over the SI joint.
25. The sole basis for Dr. Curl's opinion was based upon plaintiff's history of her various injuries. He did not review prior medical treatment records or tests. Dr. Curl diagnosed plaintiff with chronic right rotator cuff tendinitis and left medial epicondylitis with sensitivity secondary to the 3 November 1997 injury, and with right S1 joint strain secondary to the 29 September 1997 injury. There is no competent evidence to causally relate either of these conditions to alleged injuries in training. As Dr. Curl's opinion on causation is based upon plaintiff's versions of the onset of symptoms, Dr. Curl's opinion is rejected. Dr. Curl did opine that it would be unusual for rotator cuff tendinitis symptoms to not manifest until some six months after the alleged injury.
26. On 17 December 1998, board certified neurosurgeon Dr. William Bell examined plaintiff on referral from Dr. Bowman for a history of neck and right shoulder pain, and low back pain. She related a history of hitting a wall during an obstacle course exercise in September of 1997 in which she injured her right arm and shoulder and an episode of pulling a dummy from a burning car in November of 1997 in which she injured her low back, after which she noticed swelling in her left elbow. She stated she had to run to the wall, grasp ropes and climb up the wall. She struck her right shoulder going over the wall. Plaintiff told Dr. Bell that a doctor had said if the lipoma contained blood, then it was probably related to the injury. She stated that there was blood in the lipoma and it was, therefore, related. She also reported her low back pain was aggravated by long periods of time sitting or driving. Dr. Bell diagnosed plaintiff with right shoulder strain, lumbosacral strain, and right cervical radiculopathy. He ordered nerve studies, and rated plaintiff as retaining five percent impairment to her cervical spine and a five percent permanent impairment to the lumbar spine.
27. On 28 December 1998, plaintiff sought treatment from Dr. Noland Hagood in Arkansas for complaints of nasal congestion. She asked to be referred for physical therapy and for nerve conduction studies. She reported she had seen numerous doctors in North Carolina and having extensive evaluations for her chronic pain in the right shoulder, neck and back.
28. On 6 January 1999, plaintiff reported for an evaluation at Baptist Therapy Center in Arkansas on referral by Dr. Hagood for right rotator cuff tendinitis. Plaintiff reported a history of hurting all the time since she injured her right shoulder in detective school over a year ago.
29. On 14 January 1999, plaintiff filed an amendment to the Form 18 for the November 1997 incident on which it notes the nature and extent of the injury as "deep bruise (contusion) and hematoma in left arm and elbow and injury to back."
30. On 15 February 1999, Dr. John Porter performed an EMG and nerve studies, which were reported as normal and revealed no evidence of cervical radiculopathy or entrapment.
31. Defendants referred plaintiff for an orthopedic independent medical evaluation on 15 February 1999 with Dr. Alfred Rhyne. Plaintiff reported a history of attempting to go over a wall, falling approximately six feet. She did not recall if she landed on her feet, back or shoulders, but that she struck her right shoulder. Plaintiff reported a second injury in October while trying to pull a 180-pound man out of a car, during which she pulled her lower back.
32. Upon reviewing Dr. Templeton's and Dr. Bowman's notes, Dr. Rhyne concluded that "in the first two months after her injuries, I do not see any mention of low back pain in the notes surrounding the first several months by either Dr. Templeton or Dr. Bowman. Therefore, since it is not documented, I cannot consider strain to lumbar spine as being related to the accidents in September and October of 1997."
33. On 16 February 1999, plaintiff was seen by orthopedist Dr. Paul Perlik of the Charlotte Orthopedic Specialists for an independent medical evaluation of the bilateral upper arm complaints on referral by defendants. Plaintiff reported a history of a 29 September 1997 injury witnessed by 18 people, during which she stumbled and hit a wall with her right shoulder. She related a left arm injury on 3 November 1997 when pulling a man, after which she noticed a lump in her left elbow. Although a note from Dr. Bowman referred to a hemorrhage at the lipoma, there is no evidence of this in the pathology report. Dr. Perlik diagnosed plaintiff with right rotator cuff tendinitis/subacromial bursitis in the right shoulder and a lipoma at the left elbow.
34. Based upon his review of prior medical notes, Dr. Perlik opined there was no compelling evidence the lipoma was secondary to an upper left extremity injury. He further opined that he was unaware of any correlation between traumatic events and lipoma development. He further found, "The causative nature of the injury in relationship to the lipoma is rather confused by the absence of any history on the emergency room record reflecting a specific injury to that arm. As to the causation of the right shoulder problem, the temporal relationship is compelling. However, I believe it is somewhat confusing that the patient did not present for evaluation until nearly three weeks after the initial incident."
35. On 14 September 1999, Dr. Jeffrey Ketcham of Little Rock Pain Clinic saw plaintiff on referral from Dr. Hagood for evaluation of cervical, upper shoulder girdle and low back pain. Plaintiff reported a history of hitting the right side of her body while going over a wall, and bouncing and falling from the wall. She reported a second injury in November while trying to pull 160-180 pounds of dead weight from a vehicle. She stated her arms gave out; and she felt sharp pain in her low back, dropped the victim, and fell to the ground. Dr. Ketcham diagnosed plaintiff with a myofascial type pain and ordered diagnostic studies and therapy.
36. Plaintiff's cervical MRI revealed cervical disc degeneration at C5-6 and C6-7, and bulging annuli at C5-6 and C6-7. A bone scan reported mild degenerative disease of the left upper cervical spine and mild thoracolumbar scoliosis. A lumbar MRI revealed a moderate sized broad-based left foraminal disc protrusion at L4-5, mild left-sided thecal sac compression with encroachment L5 lateral recess, disc desication at L3-4 through L5-S1.
37. On 6 July 1999, Dr. Ketcham ordered an L4-5 lumbar epidural steroid injection after reviewing the diagnostic studies. On 26 July, Dr. Ketcham noted plaintiff's "response to the epidural is very unusual in that it took almost 5 to 6 days for any type of relief, and then she got relief of neck pain at the same time."
38. On 20 September 2000, board certified internist and board eligible rheumatologist Dr. Melody St. John examined plaintiff for chronic pain on referral from Dr. Hagood. Plaintiff reported a history of falling from the top of a wall, hitting the right side of her body. She reported having chronic pain since then. Plaintiff related a second injury when she tried to drag 180-pound weight from a patrol car, during which she felt a pop in her back.
39. Dr. St. John opined fibromyalgia is due to deactivation or not exercising, decreased muscle movement, probably an increase in neurotransmitters, and a decrease in Seratonin. Trauma or blows can exacerbate fibromyalgia. Dr. St. John ordered physical therapy, amitriptyline, effexor, diet and vitamins for plaintiff's fibromyalgia.
40. Plaintiff did not keep follow-up appointments with Dr. St. John in April, July, or two in early December 2000. On 17 December 2000, plaintiff returned to Dr. St. John. During that appointment, plaintiff admitted she had not been exercising daily, had not been using Capsaicin cream, had not followed the diet, and was working two jobs up to 50 to 60 hours per week. Dr. St. John opined that because plaintiff had been noncompliant with treatment, there was not a lot that could be done for plaintiff's fibromyalgia. Dr. St. John did not relate plaintiff's fibromyalgia to any alleged incidents during law enforcement training.
41. Plaintiff began treating with family physician Dr. Roddy Lochala on referral from Dr. St. John on 18 December 2001. Plaintiff reported a history of hypertension, irritable bowel syndrome, depression, fibromyalgia and left elbow pain.
42. Dr. Lochala opined plaintiff's lipoma was not related to an alleged November 1997 injury. In his experience, a lipoma may be the product of a traumatic injury, but one would not occur within a day of alleged trauma but rather would take weeks to manifest itself.
43. In her deposition taken on 20 August 2002, plaintiff testified she was first injured on 29 September 1997 in attempting to scale a six-foot wooden wall. She stated that when she attempted the maneuver, she sustained a real hard fall, dropped down and was in a lot of pain on her whole right side and shoulder. She further testified the pain was knife-like and that her right hip, foot and side of her body slammed into the wall and she fell to the ground. Although plaintiff contended she experienced this knife-like pain from her right hip to her right shoulder, she did not seek any medical treatment for this alleged injury.
44. Plaintiff further testified that after the alleged 29 September 1997 injury, Justice Academy staff did not want her to leave campus and she sat with ice on a bruise on her right elbow area. This testimony is rejected as not being credible, particularly when taken in conjunction with her 4 November 1997 emergency room visit for a lump on her left elbow.
45. Plaintiff contends that by the time she saw her family doctor on 18 October 1997, she had severe pain from the back of her rib cage down, and hurt when she stooped, crawled, walked or sat.
46. In her deposition, plaintiff testified that on 3 November 1997, she was practicing pulling a man from a car, after which she immediately noticed the lipoma on her left arm.
47. Plaintiff testified she had a second injury on 4 November 1997 when she was on the obstacle course and had to open a car door and remove a 180-pound man from behind the wheel. She stated she had to undo a seat belt, grasp the person, and get him under the armpits to drag him from the car. She contends that she felt a sharp pain in her back and her arms just quit as she tried to grasp the man under the arms, and then she fell to the ground. She contended that she sat under a tree for two hours and limped back to the dorm. During afternoon classroom work, she observed an egg-sized growth on the inside left elbow, and she went to the local hospital.
48. Although plaintiff testified she had back pain, which was excruciating enough to make her fall to the ground, she did not mention this to the emergency room physician on 4 November 1997 or to her family doctor's office when she called that office earlier that day.
49. Plaintiff contended in her deposition that she only saw Dr. St. John once a year because she could not afford to go to the doctor more than once a year. However, Dr. St. John indicated plaintiff was not set to be seen once a year, but rather that she had not kept numerous appointments and once a year seemed to be all the time plaintiff was capable of attending.
50. Plaintiff gave a number of inconsistent histories of onset of back problems to the Industrial Commission, her employer, and her various medical providers. Plaintiff alleged that on 29 September 1997 she bruised her right inner arm at the elbow when she attempted to scale a six-foot wall during basic law enforcement training on a workers' compensation report form she prepared for her employer. Since the initial report, plaintiff began to embellish her versions of the incidents of 29 September. In 1998, she reported to medical providers that she injured her back when she hit the wall. In 1999, plaintiff told various medical providers that (1) she stumbled and hit a wall during training or that she fell six feet while trying to go over the wall, and she didn't recall how she landed, but did strike her right shoulder; or (2) she hit the wall from right shoulder to hip, feeling immediate pain; (3) or that she hit the right side of her body while going over the wall after which she bounced and fell. By 2000, plaintiff reported falling from the top of a wall, hitting the right side of her body. Based upon these many inconsistent versions of injury, plaintiff's testimony is rejected as not credible on the issue of onset of back pain, which she attempts to relate to either 29 September, or 3 November 1997 alleged incidents.
51. Medical opinions rendered on the onset and causation of plaintiff's alleged right shoulder tendonitis, neck pain, low back pain, left and right arm conditions, and fibromyalgia which were based on the histories given by plaintiff are given little weight as not being competent and credible evidence, as these opinions are based upon false premises as to the causal relationship and the onset as related by plaintiff. Furthermore, there is no competent medical evidence in the record to support a finding that plaintiff's fibromyalgia was caused by any alleged workplace injury.
52. To the extent that plaintiff has embellished the history of onset of problems with the lipoma, including telling her treatment providers that she injured her left arm by pulling a 150 to 180-pound dummy from a burning or non-burning vehicle, this testimony and history is given little weight as not being a credible account of the onset of the lipoma. Rather, the best evidence comes from the telephone consultation with Dr. Bowman's office and to the Sampson Medical Center emergency room, wherein plaintiff reported that she found the nodule on her arm on the morning of 4 November, while having her blood pressure checked.
53. Based upon the competent evidence in the record, plaintiff did not sustain an injury by accident on 3 November 1997. Furthermore, the greater weight of competent medical evidence supports a finding that plaintiff's lipoma was not due to any alleged 3 November 1997 incident or activity in training.
54. Even if plaintiff's right arm bruise of 29 September 1997 constituted an injury by accident, there were no compensable consequences of this injury. Further, plaintiff did not file her claim within thirty days. Plaintiff did not give a reasonable excuse for her failure to file a written notice within thirty days of the alleged injury. Further, defendants have been prejudiced in that defendants were not given an opportunity to fully investigate the claim immediately following the incident and could have directed medical treatment had this case been accepted as compensable.
 ***********
Based on the foregoing findings of fact the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. The person claiming the benefits of compensation has the burden of proving the injury complained of resulted from an accident arising out of and in the course of the employment. Henry v. A.C. Lawrence Leather Co.,231 N.C. 477, 57 S.E.2d 760 (1950).
2. With respect to I.C. File 801090, plaintiff did not sustain an injury by accident arising out of and in the course of her employment on 3 November 1997. N.C. Gen. Stat. § 97-2(6). Therefore, she is entitled to no benefits under the Act for any alleged left arm complaints. Even assuming arguendo plaintiff's left arm lipoma or tumor was aggravated by some aspect of her law enforcement basic training, plaintiff's testimony is not credible on her activities for the date of the alleged injury and is therefore rejected. Furthermore, plaintiff's claim is barred as plaintiff did not timely file a claim for any alleged injury. N.C. Gen. Stat. § 97-22.
3. With respect to I.C. 828950, although plaintiff sustained a bruise on her inner right elbow on 29 September 1997 when she was attempting to scale a wall in law enforcement training, and this activity was not a part of her regular duties, such that it may be construed as constituting an interruption of her normal work routine thereby constituting an injury by accident under N.C. Gen. Stat. § 97-2(6). Nonetheless, there were no compensable consequences from this injury. Furthermore, plaintiff's claim is barred as plaintiff failed to timely file her claim for any alleged injury under N.C. Gen. Stat. § 97-22.
4. In evaluating expert testimony, the Commission must first determine whether the proffered expert opinion is competent before the opinion can be weighed as evidence in the case. The testimony of a medical doctor is not "competent" merely because it is uttered by a licensed physician. Expert opinion that rests on speculation and conjecture, or on unproven facts, is not sufficiently reliable to qualify as competent evidence concerning the nature and cause of the injury. Young v. Hickory BusinessFurniture, 300 N.C. 277, 538 S.E.2d 912 (2000). In the instant case, there is no competent medical evidence to support plaintiff's claim that she retains any permanent disability as a result of the right arm bruise on 29 September 1997. Medical evidence to the contrary is given little weight, as it is based upon plaintiff's false or inconsistent histories of both the nature of the alleged accident and the alleged onset of a variety of alleged symptoms.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 ORDER
1. Plaintiff's claim for workers' compensation benefits under I.C. File 801090 is, and under the law the same must be, DENIED.
2. Plaintiff's claim for workers' compensation benefits under I.C. File 828950 is, and under the law the same must be, DENIED, due to her failure to timely file her claim.
Each side shall pay its own costs.
This the 8th day of September 2003.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER